Sears, Roebuck & Company, Petitioner *v.* Commonwealth of Pennsylvania, Workmen's Compensation Appeal Board and Lois J. Moore, Respondents.

162

Argued October 3, 1979, before Judges ROGERS, DI-SALLE and CRAIG, sitting as a panel of three.

*John E. Smith*, with him *William F. Sweeney* and *Harvey Pennington, Herting & Renneisen*, for petitioner.

*Arthur G. Girton*, for respondent.

Opinion by Judge Craig, December 20, 1979:

The claimant's decedent suffered a myocardial infarction and died on February 16, 1977. The Workmen's Compensation Appeal Board (board) affirmed the decision of the referee awarding fatal claim benefits under The Workmen's Compensation Act.[1] The decedent's employer has appealed.

Claimant's decedent was a refrigerator repairman, exposed for 23 years to extremely cold temperatures and freon gas in his work. At the time of his death, the employer had been paying him temporary total disability compensation for a condition in his hands which his physician referred to as trenchhand or cold-exposure arteritis, a condition of insufficient blood supply to an extremity. His fingers had become chronically sore, cold and at times extremely painful. Spasmodic contractions of the small blood vessels in the fingers ("vasospasm") caused the extreme pain.

To relieve the acute discomfort caused by vasospasm, the treating specialist, Dr. Horwitz, recommended first an arteriogram and then a sympathectomy, a surgical procedure in which a sympathetic nerve regulating blood flow to the hand is severed in order to eliminate the contractions causing the spasms, so that circulation to the extremity could increase.

Shortly after those tests and surgery, decedent developed an atrial fibrillation, a potentially lethal irregularity in the heartbeat. Quinidine quelled the problem at that time. A few months later he suffered the infarction which was the immediate cause of his death.

There is no dispute that claimant's "trenchhand" was a compensable work-related disability.

The referee made the following extensive finding:

The medical evidence shows and the referee finds that the myocardial infarction . . . was

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §1 et seq.

directly related to the arteritis (the trench-hand) sustained by claimant in his work as a refrigerator repairman and/or from the surgical intervention by claimant's medical expert in an effort to overcome the arteritis and the vasospasm. . . .

The arteritis and subsequent vasospasm were due to the cold exposure. The treatments administered to claimant's decedent were because of this. As a direct result of both the condition and the treatment therefor, in an effort to effect a cure, claimant's decedent suffered the sudden onset of the events [including the atrial fibrillation] that culminated in his death by myocardial infarction. Had claimant's decedent not had the exposure or the treatment, he would not have had the myocardial infarction which resulted in his demise. . . .

The general issue is whether the record reveals competent medical evidence to support adequately the finding of a causal connection between the work-related disability and decedent's death.

We are confronted with the rule that where there is no obvious causal relationship between an employe's injury or death and a work-related incident, claimant must present unequivocal medical testimony to carry his burden of proof on causation. The medical testimony must establish, not that the injury or condition might have or possibly resulted from the assigned cause, but that in the professional opinion of a qualified medical witness, the result in question did come from the assigned cause. *See, e.g., Owens v. Workmen's Compensation Appeal Board*, 39 Pa. Commonwealth Ct. 510, 395 A.2d 1032 (1979); *American Refrigerator Equipment Co. v. Workmen's Compensation Appeal Board*, 31 Pa. Commonwealth Ct. 590, 377 A.2d 1007 (1977); *Workmen's Compensation Appeal*

*Board v. Bowen*, 26 Pa. Commonwealth Ct. 593, 364 A.2d 1387 (1976); *Workmen's Compensation Appeal Board v. Allied Chemical Corp.*, 20 Pa. Commonwealth Ct. 562, 342 A.2d 766 (1975); *Workmen's Compensation Appeal Board v. Adley Express Co.*, 20 Pa. Commonwealth Ct. 251, 340 A.2d 924 (1975); *Dunlap v. Workmen's Compensation Appeal Board*, 17 Pa. Commonwealth Ct. 19, 330 A.2d 555 (1975).

In this case, employer's medical expert presented a positive opinion that there existed no connection between the arteritis of the hand and the heart attack. The other medical expert witness, Dr. Horwitz, the treating cardiovascular specialist, testified on direct examination as follows:

A. . . . Mr. Moore had exposure to his hand causing an arteritis. There is no question about that at all. That is as close to a certainty as we can get in a biological science.

This kind of arteritis can and frequently does cause arterities elsewhere. It could have caused an arteritis of the vessels of the heart.

Furthermore, Mr. Moore had this arteriogram, which I had him have and following the arteriogram he developed a cardiac irregularity.

Dr. Horwitz continued:

A. I will give you an opinion at the end, but I want to put this thing down so that I will feel perfectly okay about it.

. . . .

He could have had another irregularity before he became involved with working in the cold room and getting his hands. exposed to cold. He had had neither an arteritis any place, nor had he had any cardiac irregularities.

I admit he had these cardiac irregularities as a result of the tests that he had performed, but he never would have had the tests performed had he not had this [cold-exposure arteritis].

So, *if you ask do I believe that, and as I say, I cannot prove that, but it would be my belief that* Mr. Moore's eventual demise was due to the fact that he had had cold exposure, and the treatments that he had, which was certainly the treatment that I personally recommended. If he had not had neither the exposure nor the treatment, he probably would not have had the myocardial infarction. (Emphasis added.)

Referring specifically to heart attack cases, we have said that we do not believe that, "[T]he mere absence of the magic words 'his work caused his heart attack' should necessarily preclude the recovery of benefits where the referee who personally heard the testimony determined that the requisite causation was present." *Workmen's Compensation Appeal Board v. Bowen,* 26 Pa. Commonwealth Ct. at 598, 364 A.2d at 1390.

The opinion of the doctor, quoted above, standing alone, would suffice as an unequivocal statement, that, although it may be impossible to isolate and structure with scientific precision, the exact causal sequence leading to the infarction, nevertheless, he believed that in his professional opinion the heart attack resulted from some combination of the pre-existing arteritis and the treatments administered in an effort to alleviate it.

As we have noted previously, "[W]here the injury suffered was a heart attack . . . medical testimony need not be given . . . with unqualified certainty." *Workmen's Compensation Appeal Board v. Bowen,* 26 Pa. Commonwealth Ct. at 596, 364 A.2d at 1389. All

that is required is that the medical expert testify with a reasonable degree of medical certainty.[2] On direct examination, the doctor in this case voiced his opinion with sufficient positiveness to satisfy the unequivocality rule.

However, petitioner-employer calls our attention to several portions of the expert's testimony, especially certain portions of his cross-examination, in an effort to have us conclude that it was reversible error for the referee to have adopted the opinion that he stated on direct.

Employer's brief argues: (1) that the basis for the opinion expressed on direct examination was insufficient because Dr. Horwitz was unsure as to the cause and timing of the atrial fibrillation, contended by the employer to be a link indispensable to the opinion proffered; (2) that his testimony must be considered incredible as a matter of law; or, (3) that his opinion must fall short of the unequivocality standard when compared with certain portions of his testimony elicited on cross-examination.

As to the basis for the expert opinion being insufficient, employer contends that the hypothetical question posed to the doctor did not include the essential fact of the timing of the atrial fibrillation, and cross-examination showed him to have been mistaken as to where the fibrillation fit into the sequence of events.

A review of the testimony reveals that the physician was somewhat imprecise as to when the cardiac

---

[2] A review of the record reveals that Dr. Horwitz had some misgivings in dealing with the legal phrase "a reasonable degree of medical certainty." However, despite his reservations with the use of that phrase, at one point he equated such certainty with that amount of certainty which he would require of himself in treating a patient. That is clearly more than speculation. An expert need not express his opinion in the precise terms used to articulate a legal standard. *Commonwealth v. Williams*, 432 Pa. 44, 246 A.2d 356 (1968).

irregularity occurred. However, the essential link in his causation theory was that the irregularity resulted in part from the treatments, either the arteriogram or the sympathectomy. Significantly, therefore, he remained aware of the fact that the irregularity occurred *after* the treatments. That awareness is affirmed by the doctor's testimony that he did not recommend a second sympathectomy for the left hand because " [T]here was an incident that occurred following the sympathectomy on the right hand [the cardiac irregularity] that deterred him from having the left hand done.'"[3]

---

[3] Also significant on this point is the following exchange on cross-examination:

Q. But, Doctor, before when you testified on direct it was your impression, was it not, that the irregularity had occurred during the arteriogram procedure; is that correct?

A. No, I don't believe I said that. I think that what I said was—I think you asked me how I remembered it now, and there was another patient that I had recently who did have a direct—but I said that I thought that in Mr. Moore's case that the irregularity occurred after he had been discharged from the hospital for that procedure.

Q. Doctor, my recollection is that when I first asked you about that, that is what you said, but when Mr. Girton first inquired during the proceedings this morning as to your opinion as to whether or not the death was related to employment you said, yes, because he developed this complication during the arteriogram. Now, the record will bear us out, whichever one of us said it first or recollects correctly.

Is it your testimony now, however, after we have been into this for a while that he did not have any complications during the arteriogram?

A. *During the arteriogram, yes, I thought I said that before that I didn't think he had anything during the arteriogram, but he developed at a later time atrial fibrillation, which could have been due to the arteriogram, or could have been due to whatever trauma you get into when you do surgery on anybody when you cut sympathetic nerves, and so forth.* (Emphasis added.)

Thus, although expert testimony may be incompetent if it lacks an adequate basis in fact, *Hussey v. May Department Stores, Inc.*, 238 Pa. Superior Ct. 431, 435, 357 A.2d 635, 637 (1976), our review of the record convinces us that Dr. Horwitz had sufficient facts before him upon which to express an opinion.

With respect to the part played by the atrial fibrillation in the causal connection to the death, we come to the core of petitioner's argument, that the expert's opinion, when compared to portions of his testimony on cross-examination, must be considered either too incredible or equivocal as a matter of law.

As to the incredibility of the testimony, we must first consider the fact that Dr. Horwitz had earlier written a letter to the employer stating that Moore's hospitalization for the fibrillation was not employment-related. When questioned about that letter, the doctor admitted that, in light of the subsequent heart attack and death, he had changed his earlier opinion and came to believe that causation existed, although not with scientific certainty.

A change in a diagnosis made or opinion held by a qualified physician from one held earlier in a patient's history would go only to the weight to be accorded the current opinion. It simply amounts to a withdrawal of the earlier opinion, which does not make the current opinion incredible as a matter of law, as long as the current opinion has an adequate basis in fact, *Compare, Brannan v. Lankenau Hospital*, 254 Pa. Superior Ct. 352, 356, 385 A.2d 1376, 1379-82 (1978) *with Workmen's Compensation Appeal Board v. Gimbel Brothers*, 19 Pa. Commonwealth Ct. 176, 338 A.2d 755 (1975) ; and "it is the function of the referee, not that of appellate courts, to determine the credibility of, and weight to be given to, the testimony of medical experts." *Columbus Service International v. Workmen's*

*Compensation Appeal Board,* 17 Pa. Commonwealth Ct. 441, 445, 333 A.2d 233, 236 (1975).

We must bear in mind the referee's unique fact-finding function, which commits to him alone questions of credibility and choice between conflicting testimony, including a witness's inconsistent testimony, as well as the conflicting testimony of two or more witnesses, in which he may exercise his discretion to accept or reject testimony in whole or in part. *American Refrigerator Equipment Co. v. Workmen's Compensation Appeal Board, supra.*

Concerning equivocality, as Judge MENCER aptly noted in the *American Refrigerator Equipment Co.* case, "Equivocality under the pertinent rule concerns the certainty or positiveness of testimony, not, as with inconsistent testimony, the credibility." (Citations omitted.) 31 Pa. Commonwealth Ct. at 597 n.3, 377 A. 2d at 1010 n.3.

Expert testimony should be reviewed in its entirety to determine if it expresses the reasonable medical certainty required. *Martinique v. Workmen's Compensation Appeal Board,* 45 Pa. Commonwealth Ct. 67, 404 A.2d 778 (1979); *Kravinsky v. Glover,* Pa. Superior Ct. , , 396 A.2d 1349, 1356 (1979).

To resolve the question of equivocality, we have carefully reviewed the cross-examination of Dr. Horwitz dealing with the causal link played by the atrial fibrillation.[4]

---

[4] The pertinent portions of the cross-examination are as follows:

> Q. . . . Now, do you have any information as to cause of the fibrillation?
>
> . . . .
>
> A. . . . I don't know why he got plugged up with blood —I know why he got the plugging up of the blood vessels in his fingers. I don't know why he got all of the other things. *What I said was that this was how I believed the thing happened.*

We do not read that testimony as a retreat from the positiveness of his conviction expressed on direct examination so as to require us to reverse the referee and board on the issue of equivocality.

---

Q. Do you know why he got fibrillation, with a reasonable degree of medical certainty?

A. No, I don't.

. . . .

He only developed atrial fibrillation one time, I believe, unless he developed it just before he died, which he could have done, because I mean nobody was around. But a lot of people who die of coronaries die as a result of heart irregularity.

But I don't know why he developed that. *I didn't mean to infer that I knew for sure about that. . . .*

Q. Doctor, you also authored a letter. . . . At the time you authored the letter, you had no—

A. Premonition of—

. . . .

Q. Let me finish the question. You had formed no opinion that any of his atrial fibrillation was related to his work, had you?

A. No. I never thought that the atrial fibrillation was —I mean, if I had to bet on his atrial fibrillation as to his work, I am sure you could get atrial fibrillation by exposure to cold, but I don't know any evidence of that, and I would not think that that would have anything to do with his work directly.

However, my only thought about the atrial fibrillation part would be that he could have gotten it as a result of the factors that his work caused him to have, such as the tests that I ordered.

Q. But when you wrote to Sears you reported that only the admission for the sympathectomy was related to work, and that the admission to the Pennsylvania Hospital for the fibrillation was not; isn't that correct?

A. That is right. . . .

That is what I said. Naturally, I mean, I didn't know it was going to come to anything like this at the time.

But I think, as I just told you, I don't believe that the atrial fibrillation was directly related to his work.

Q. Was it even indirectly related to his work?

A. It might have been.

It rather demonstrates that he remained cognizant that experts may differ and that other reasonable medical opinions based on the same patient history were possible. As the board pointed out, he was an extremely candid witness, one who continually remained mindful of the lack of scientific certainty which surrounds this type of medical causation question. That the expert repeatedly acknowledged the lack of scientific verification possible does not detract from the positiveness of the opinion he personally held.

Thus, this case is distinguishable from *Rosenberry Brothers Lumber Co. v. Workmen's Compensation Appeal Board*, 36 Pa. Commonwealth Ct. 283, 387 A. 2d 526 (1978) and *Royesky v. Workmen's Compensation Appeal Board*, 34 Pa. Commonwealth Ct. 274, 383 A.2d 566 (1978).

In *Rosenberry Brothers Lumber Co.*, we reversed the award of benefits because the doctor there testified that he could not make a statement as to whether or not the claimant's heart attack was work-related and that it could have been the result of any number of factors. He was unwilling to adopt personally a positive causation opinion. The expert's opinion in that case consisted only of the expressed possibility that the heavy lifting ''could have been'' or ''may''

. . . .

Q. You can't say with a reasonable degree of medical certainty though, can you, Doctor, that the atrial fibrillation was related to his work, even indirectly?

A. Well, again, we come down to the matter of semantics of what a reasonable degree of medical certainty is, and I would have to say—also if you would ask me the opposite that I would say that it was not indirectly related to his work. I could not state either with any degree of certainty.

Q. Can atrial fibrillation lead to an infarction?

A. Yes, indeed. (Emphasis added.)

have been the impetus that triggered the chain of events which culminated in claimant's heart attack.

Similarly, in *Royesky*, we affirmed the denial of benefits because the referee did not find unequivocal the medical expert's testimony that the intracerebral hemorrhage suffered may or may not have been caused by bending over at the work site.

In contrast, here, although the medical witness candidly and continually acknowledged that reasonable medical opinion to the contrary was plausible, he nevertheless retained his own personal professional belief that the requisite causation existed.[5]

Accordingly, we will affirm.

## ORDER

AND Now, this 20th day of December, 1979, the order of the Workmen's Compensation Appeal Board, dated October 17, 1978, at A-75414 is affirmed.

Judgment is entered against petitioner, Sears, Roebuck & Company, and in favor of claimant, Lois J. Moore, as follows: death compensation benefits for claimant and three minor children, at the rate of $183.46 per week, beginning February 16, 1977 and continuing thereafter up to but not including December 11, 1977, when the minor child, William Moore, reaches his eighteenth birthday; death compensation benefits for claimant and two minor children at the

---

[5] We find no merit to the contention that it was erroneous to award benefits and interest for the period of time between the date of death and the date that the fatal claim petition was filed because the fatal claim petitioner gave no notice to the employer. The 1972 amendments to the Act would seem to have no effect on the equitable considerations that earlier led our Superior Court to conclude:

It is reasonable to require an employee to give notice of his injury to his employer but, . . . it would not be reasonable to impose that burden on his widow or children.

*Lambing v. Consolidation Coal Co.*, 161 Pa. Superior Ct. 346, 355, 54 A.2d 291, 296 (1947).

rate of $183.46 per week beginning December 11, 1977 and continuing thereafter up to but not including March 30, 1979 when the minor child, Timothy Moore, reaches his eighteenth birthday; death compensation benefits for claimant and one child at the rate of $165.11 per week beginning March 30, 1979 and continuing thereafter up to but not including May 20, 1981 when the minor child, John J. Moore, reaches his eighteenth birthday; death compensation benefits for the claimant alone at the rate of $140.35 per week beginning May 20, 1981 and continuing thereafter for the duration of claimant's widowhood; interest at the rate of ten per centum per annum shall be due on all deferred amounts of compensation payable hereunder.

Judgment is further entered against petitioner and in favor of claimant in the amount of $1,500.00 as reimbursement to claimant for burial of her decedent and in the amount of $426.60 as reimbursement for the cost of the earlier proceedings in this matter before the Pennsylvania Department of Labor and Industry referee, Fred J. Toils.

Twenty per centum of the gross recovery or the claimant under this judgment is to be charged against this judgment and paid directly to Arthur G. Girton, Esquire, claimant's counsel, as an attorney's fee, the balance of said judgment to be paid directly to claimant.