# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Monacacy Valley Electric, Inc., :
                             Petitioner :
                                      :
           v. : No. 244 C.D. 2020
                                      : Submitted: August 21, 2020
Workers' Compensation Appeal :
Board (Walker), :
                        Respondent :

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge[1]
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                     **FILED:  April 20, 2021**

      Monacacy Valley Electric, Inc. (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board), dated February 5, 2020. The Board affirmed the decision of a Workers' Compensation Judge (WCJ), granting the claim petition filed by Calvin Walker (Claimant).  For the reasons set forth below, we affirm the Board's order.

## I.  BACKGROUND

      Claimant worked for Employer as an electrician supervisor. On November 25, 2015, Claimant sustained a work-related injury to his left shoulder and neck.  Employer denied liability for Claimant's work-related injury

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

by issuing a notice of compensation denial on December 17, 2015. Thereafter, on December 22, 2015, Claimant filed a claim petition against Employer, asserting that he sustained a left upper extremity injury and a neck injury with radiculopathy while working for Employer on November 25, 2015, and was disabled as a result thereof as of December 4, 2015.[2] During the pendency of these proceedings, Claimant also made a claim for disfigurement benefits relative to a scar that resulted from the cervical spine surgery performed to treat his neck injury.

In support of his claim petition, Claimant testified before the WCJ at the hearings held on March 31, 2016, and May 20, 2016. At those times, Claimant testified that, on November 25, 2015, he was installing/hanging a light on a building at the Bellefonte Pumping Station in Alexandria, Virginia. (Reproduced Record (R.R.) at 46a-47a.) As he stepped down off a ladder, his feet got wrapped up in plastic that had been balled up and thrown into an access panel hole, causing him to fall and strike his left shoulder and the left side of his head on the concrete floor/ground. (*Id.* at 47a-48a, 73a-74a.) Following the fall, Claimant immediately began to experience pain in his left shoulder and mid-neck area, which he described as a pinching sensation with "burning" and numbness in his left arm. (*Id.* at 48a-49a.) Three days later, Claimant continued to experience pain and sought treatment for his injury at the Chambersburg Hospital emergency room. (*Id.* at 51a-52a, 75a-76a.) The following week, Claimant returned to work for Employer in his regular position for three days, but had difficulty with overhead activities due to the pain in his neck and left arm. (*Id.* at 55a-56a.)

---

[2] Around that same time, Claimant filed a second claim petition, alleging that he sustained a work-related low back injury while working for Employer on April 4, 2013. That claim petition, as well as Claimant's April 4, 2013 work-related injury, are not relevant to this appeal, and, therefore, we will not discuss them in any further detail in this opinion.

2

Claimant testified further that he has treated with various doctors for his work-related injury, including, but not limited to, Mark A. Knaub, M.D. (*Id.* at 52a-54a.) Dr. Knaub performed surgery on Claimant's neck on March 18, 2016. (*Id.* at 53a.) Shortly thereafter, Claimant developed an infection and underwent an additional surgery. (*Id.* at 76a, 78a-79a.) Claimant explained that, since the March 18, 2016 surgery, he has not experienced any pain, including the pinching and burning sensation, in his left shoulder or neck. (*Id.* at 54a.) Claimant did not, however, believe that he had fully recovered from his November 25, 2015 work-related injury or that he was capable of returning to his pre-injury position with Employer without restrictions. (*Id.* at 57a.) As of the May 20, 2016 hearing, Claimant had not yet been released to return to work. (*Id.* at 78a.)

Claimant further indicated that, in 2004, prior to the November 25, 2015 work-related incident, he underwent fusion surgery to his cervical spine at C4-5. (*Id.* at 48a-49a.) Following that surgery, Claimant did "fairly good." (*Id.* at 49a.) In fact, Claimant explained that during the time leading up to the November 25, 2015 work-related incident he had not experienced any "out of the ordinary" neck pain or radicular pain, he did not have any work restrictions relative to the condition of his neck, and he did not have any difficulty performing the essential functions of his job with Employer. (*Id.* at 48a-50a.)

Claimant also presented the deposition testimony of Dr. Knaub, who is board certified in orthopedic surgery. (*Id.* at 149a.) Dr. Knaub testified that he first treated Claimant on February 22, 2016, for complaints of neck pain that radiated into his left shoulder and down his left arm. (*Id.* at 151a.) At that time, Dr. Knaub performed a physical examination, which revealed decreased strength in Claimant's left arm with interossei and wrist extension and a positive Spurling's sign in Claimant's left

3

arm. (*Id.* at 153a-54a.) As part of his initial evaluation of Claimant, Dr. Knaub also reviewed Claimant's medical records. (*Id.* at 153a.) Dr. Knaub explained that, in January 2006, prior to coming under his care, Claimant underwent an electromyography (EMG)/nerve conduction study, which revealed an acute lesion at C6-7. (*Id.* at 152a-53a.) Claimant also underwent a magnetic resonance imaging (MRI) of his cervical spine on December 7, 2015, which revealed a previous cervical fusion at C4-5, degenerative changes at C3-4, C5-6, and C6-7, central and foraminal stenosis at C5-6 and C6-7 that was more significant on the left side at C6-7, and bilateral nerve root compression that was more significant on the left at C5-6 and was caused by disc herniation at C5-6 and C6-7. (*Id.* at 153a-55a.)

Based upon his initial evaluation of Claimant, Dr. Knaub concluded that Claimant's symptoms were most consistent with C6 radiculopathy. (*Id.* at 155a.) Given that conservative treatment—*i.e.*, injections and non-steroidal anti-inflammatory medication—did not improve Claimant's symptoms, Dr. Knaub informed Claimant that surgery was an option to treat his injury. (*Id.* at 152a, 155a-56a.) On March 18, 2016, Dr. Knaub performed a C5-6, C6-7 anterior cervical discectomy and fusion, with iliac crest autograft, instrumentation, and the removal of a cervical plate over Claimant's prior fusion at C4-5. (*Id.* at 156a.) Two weeks following the surgery, Claimant experienced drainage from his surgical incision, and Dr. Knaub performed a second surgery—an irrigation and debridement—to remove what Dr. Knaub described as a superficial infection. (*Id.* at 157a.) Following that surgery, Claimant treated with Hershey Medical Center's infectious disease department. (*Id.* at 158a.) As of August 11, 2016, the date of Dr. Knaub's last treatment of Claimant, Claimant continued

4

to: (1) experience pain in his neck and left arm; (2) treat with the infectious disease department; and (3) take medications for the infection. (*Id.*)

Ultimately, based upon the medical records that he reviewed, his physical examination and treatment of Claimant, and the history provided to him by Claimant, Dr. Knaub opined within a reasonable degree of medical certainty that, as a result of the November 25, 2015 work-related incident, Claimant sustained C6 radiculopathy. (*Id.* at 162a.) When questioned about whether Claimant may have sustained an aggravation to a preexisting condition in his cervical spine, Dr. Knaub explained:

> It's clear from the records that he had treated for his cervical spine intermittently over the course of the preceding two or three years. So, he certainly had some issues with his neck, but they weren't to the point where it kept him from working. They weren't to the point where he was seeking surgical treatment for it.
>
> So, he certainly had pre[]existing surgical issues, but this injury is an exacerbation of those that led him to seek more aggressive treatment.

(*Id.* at 162a-63a.) Dr. Knaub acknowledged, however, that he defined the exacerbation of Claimant's cervical spine condition based upon Claimant's increase in pain following the November 25, 2015 work-related incident. (*Id.* at 169a-70a.) Dr. Knaub further indicated that, but for the November 25, 2015 work-related injury, he did not believe that Claimant would have needed the March 18, 2016 surgery. (*Id.* at 163a.) Dr. Knaub further opined that, based upon Claimant's persistent symptoms, he did not believe that Claimant has fully recovered from his November 25, 2015 work-related injury and that, as a result of the work-related injury, Claimant has been unable to perform his regular-duty position with Employer at all times since November 25, 2015. (*Id.* at 158a-59a, 163a-64a.) Dr. Knaub also indicated that, as of August 11, 2016, the date of Claimant's last visit, he would place

5

Claimant under restrictions of no overhead activities and no lifting more than 25 pounds. (*Id.* at 163a-64a.)

While he admitted that there were no significant changes or differences in the anatomical structure of Claimant's spine between the September 2015 MRI, which was performed before the November 25, 2015 work-related incident, and the December 7, 2015 MRI, which was performed after the November 25, 2015 work-related incident, Dr. Knaub stated that this lack of significant changes or differences did not alter any of his opinions. (*Id.* at 158a-59a, 164a-65a, 169a-70a.) Dr. Knaub explained that a person with a preexisting spine condition can suffer an increase in pain following trauma and that a preexisting spine condition does not always result in pain or require treatment. (*Id.* at 165a.) In fact, Dr. Knaub noted that, as of October 5, 2015, Paul Asdourian, M.D., did not recommend any type of surgery or injections for the treatment of Claimant's cervical spine condition and discharged Claimant from his care. (*Id.* at 170a-71a.) On the other hand, Dr. Knaub admitted that Vasantha R. Kumar, M.D.'s office notes from October 2, 2015, which he did not review prior to his deposition, indicated that Claimant "may need C3-4 surgery in the future." (*Id.* at 171a-72a.) In response thereto, however, Dr. Knaub indicated that the surgery/procedure that he performed on Claimant's cervical spine addressed C4 to C7, not C3-4. (*Id.* at 172a.)

In opposition to Claimant's claim petition, Employer presented the deposition testimony of Chad Rutter, D.O., who is board certified in orthopedic surgery. (*Id.* at 175a.) Dr. Rutter performed an independent medical examination (IME) of Claimant on July 18, 2016, which included reviewing Claimant's medical records and diagnostic studies, obtaining a history, and performing a physical examination. (*Id.* at 177a-83a.) With respect to findings of significance within Claimant's

6

medical records, Dr. Rutter noted: (1) office notes from Parkway Surgery Center in 2008 indicated that Claimant was treated for complaints of neck and left shoulder pain; (2) an MRI of Claimant's neck performed in 2013 revealed mild stenosis at the level above the C4-5 fusion; (3) office notes from Summit Primary Care on July 31, 2014, indicated that Claimant reported a five-week history of increased neck discomfort, paresthesia into the upper extremities, and headaches in the posterior aspect of the neck, which the medical provider indicated were suggestive of nerve root compression; (4) office notes from January 12, 2016, indicated that Claimant complained of left shoulder pain following a fall and the medical provider questioned whether Claimant's symptoms stemmed from his cervical region; (5) office notes from August 20, 2015, indicated that Claimant complained of neck pain and bilateral arm pain and was scheduled to see a neurosurgeon the following week; (6) office notes from Cumberland Valley Neurosurgical Consultants on August 21, 2015, indicated that Claimant had recently developed severe neck pain and radicular pain in the upper extremities that worsened significantly at night and interfered with his sleep; (7) Dr. Kumar's office notes from October 2, 2015, indicated that Claimant was seen for a second opinion relative to his pain and arm symptoms and that Dr. Kumar had diagnosed Claimant with bilateral carpal tunnel syndrome, left ulnar neuropathy at the elbow, and a C3-4 disc bulge, recommended that Claimant undergo carpal tunnel surgery, and suggested that C3-4 surgery would be likely in the future; and (8) Dr. Asdourian's office notes from October 1, 2014, indicated that Claimant complained of increased pain in his neck without a precipitating event, constant numbness in the right hand, occasional numbness in the right forearm, and problems performing overhead work. (*Id.* at 183a-86a.) Dr. Rutter also indicated that there were no changes between the

September 18, 2015 and December 7, 2015 MRIs of Claimant's cervical spine; they both demonstrated a fusion at the C4-5 level, a centralized disc bulge at the C3-4 level, which was causing mild to moderate central canal stenosis, and a disc bulge at the C5-6 and C6-7 levels, which was slightly greater on the right and was causing foraminal narrowing. (*Id.* at 187a.)

Based on the results of his IME, Dr. Rutter opined within a reasonable degree of medical certainty that Claimant did not sustain a work-related injury on November 25, 2015. (*Id.* at 188a.) Dr. Rutter explained that Claimant's medical records demonstrate that Claimant was having problems with his neck, including radicular symptoms, prior to November 25, 2015, and that the symptoms were significant enough to warrant the September 18, 2015 MRI of Claimant's cervical spine and opinions from two different neurosurgeons. (*Id.* at 188a, 209a.) Dr. Rutter further explained that, given that there was no change between the September 18, 2015 and December 7, 2015 MRIs of Claimant's cervical spine, he did not "believe that [he could] state that there was a work injury." (*Id.* at 189a, 198a, 209a-10a.) While he admitted that a fall like Claimant described could exacerbate a cervical spine condition, Dr. Rutter did not believe that Claimant's medical records supported such a conclusion. (*Id.* at 210a.)

Dr. Rutter acknowledged that Dr. Asdourian's office notes from October 5, 2015, indicated that Dr. Asdourian did not believe that there was a problem with Claimant's cervical spine that required surgery and even suggested that the numbness in Claimant's hands could have been from carpal tunnel syndrome. (*Id.* at 200a-01a.) Dr. Rutter further acknowledged that Claimant returned to Dr. Asdourian on December 14, 2015, and that, at that time, Dr. Asdourian noted that Claimant had "disabling neck and left arm paresthesia[]

8

following a work-related injury that occurred on November 25, 2015," took Claimant out of work, and recommended that Claimant receive cervical epidural steroid injections. (*Id.* at 203a-04a.) Based upon those records, Dr. Rutter admitted that Dr. Asdourian's recommendations relative to Claimant's cervical spine were different in December 2015 from what they had been in October 2015. (*Id.* at 204a.) Dr. Rutter further admitted that, based on the medical records that he reviewed, he was not aware of any work restrictions imposed on Claimant by any medical provider prior to November 25, 2015. (*Id.* at 207a-08a.)

At some point after the parties submitted their medical evidence into the record, the WCJ closed the record and issued a briefing schedule. (*Id.* at 86a; Certified Record (C.R.) at Item No. 22.) Subsequent thereto, at a hearing held on February 3, 2017, Employer's counsel requested that the WCJ reopen the record to give Employer the opportunity to present additional evidence relative to an allegation that Claimant had been working since August 2016. (R.R. at 83a-88a.) In support of his request, Employer's counsel explained that Employer's insurance company's fraud unit received an anonymous tip that Claimant had been working since August 2016 under the name of his son's company, K.L. Walker Electric, and had been subcontracting for John Chamberlain Electric at Keystone Biofuels. (*Id.* at 83a-84a.) Employer's counsel further explained that, earlier that week, he served subpoenas on those companies in an effort to obtain documentation proving that Claimant had in fact been working since August 2016. (*Id.* at 84a-85a.) Despite objection from Claimant's counsel, the WCJ relisted the matter for a subsequent hearing to allow Employer to present fact witnesses and to further cross-examine Claimant, but only if the parties deemed it necessary after reviewing the documentation received in response to Employer's subpoenas. (*Id.* at 86a-93a.)

9

At the next hearing, which was held on April 6, 2017, Employer's counsel cross-examined Claimant relative to his ongoing disability—*i.e.*, whether he had worked in any capacity or earned any income since the time that he last testified— and his involvement with K.L. Walker Electric, John Chamberlain Electric, and Keystone Biofuels. (*Id.* at 101a-03a.) Employer also offered the testimony of Dawn Chamberlain, who serves as the secretary and bookkeeper for John Chamberlain Electric. (*Id.* at 110a.) Ms. Chamberlain testified regarding alleged work that Claimant performed for John Chamberlain Electric as a subcontractor from August to December 2016. (*Id.* at 110a-17a.) At the conclusion of the hearing, Employer's counsel requested the opportunity to present additional rebuttal testimony relative to Claimant's ongoing disability and Claimant's receipt of the subpoena for K.L. Walker Electric—K.L. Walker Electric uses Claimant's home address as its business address. (*Id.* at 102a, 133a-34a.) Claimant's counsel objected to Employer's request. (*Id.* at 134a-35a.) In response thereto, the WCJ noted: "Let me think on this and you'll get either a notice relisting [the matter for another hearing] or else I'll [issue a] decision." (*Id.* at 139a.)

By decision and order dated July 6, 2017, the WCJ granted Claimant's claim petition. In so doing, the WCJ concluded that Claimant met his burden of proving: (1) he sustained a work-related injury on November 25, 2015, while working for Employer; (2) as a result of his November 25, 2015 work-related injury, he has been unable to perform his pre-injury position with Employer, and Employer has not offered him suitable, modified-duty work within his restrictions; and (3) he sustained permanent disfigurement in the form of a scar on his neck as a result of the November 25, 2015 work-related injury. Employer appealed the WCJ's decision to the Board. With respect to Claimant's disfigurement claim, the Board concluded

10

that the WCJ failed to make any determination relative to the seriousness of Claimant's scar, whether the scar was unsightly, and whether the scar was not usual or incident to Claimant's employment. The Board explained further that the "WCJ relayed no detailed description of his personal viewing of the scar and offered no explanation of how that viewing translated into [his] award." (Board's Decision, Oct. 16, 2018, at 15.) As a result, the Board remanded the matter to the WCJ to issue any and all findings of fact and conclusions of law necessary to adequately resolve Claimant's disfigurement claim. The Board affirmed the WCJ's decision in all other respects.

On remand, the WCJ held a hearing for the sole purpose of viewing Claimant's scar and providing a more definitive description of the scar for the record. Thereafter, by decision and order dated March 6, 2019, the WCJ again granted Claimant's claim petition.[3] In so doing, the WCJ made the following relevant findings/conclusions and credibility determinations:

3. This [WCJ] finds that the testimony of Claimant was credible. [Employer] did not discredit Claimant through cross-examination of Claimant and did not present factual testimony to rebut Claimant. Claimant was credible that he has not fully recovered from his work injury, in his description of the mechanism of injury, in his complaints of pain related to the injury and in the periods of disability following the injury.

. . . .

5. This [WCJ] finds that the opinions of Dr. Knaub are credible, unequivocal and legally competent. Dr. Knaub opined that Claimant sustained an injury at work on November 25, 2015[,] that includes C6 radiculopathy, [a] herniated disc, acute nerve root lesions at or about the left C6-[]7 nerve roots, cervical radiculopathy aggravated by the work injury, post[]operative

---

[3] Although the Board remanded the matter to the WCJ solely on the issue of Claimant's disfigurement claim, the WCJ appears to have issued a new determination addressing the entirety of Claimant's claim.

11

wound infection complicated with cervical hardware with methicillin-sensitive Staph aureus (MSSA) and anaerobic gram-positive cocci, [a] left shoulder injury, and removal of hardware from C4-[]5 with placement of hardware at C4-[]7. Dr. Knaub opined that it is clear from the records that Claimant treated for his cervical spine intermittently over the course of the preceding two or three years, that Claimant had some issues with his neck but they were not to the point where they kept him from working and he was not seeking surgical treatment for them. Dr. Knaub opined that the November 25, 2015 injury is an exacerbation of those preexisting conditions that led Claimant to seek more aggressive treatment. The more aggressive treatment Claimant endured included the shoulder work up subsequent to November 25, [2015,] the EMG in January of 2016, the injections and ultimately the surgeries. Dr. Knaub opined that Claimant would not have needed the surgery at this time if not for the November 25, 2015 work injury. Dr. Knaub opined that Claimant has not been able to do his regular job at any point since November 25, 2015, and the basis for Claimant not being able to perform his regular job is due to the work injury of November 25, 2015. Dr. Knaub opined that Claimant is not fully recovered from the work injury due to his persistent symptoms. Dr. Knaub would restrict Claimant from lifting more than 25 pounds and have Claimant avoid overhead activity. The length of the restrictions will depend on how Claimant does clinically in terms of his symptoms, so that if he continues to have symptoms, he will remain restricted. Dr. Knaub opined that the surgical scar is permanent.

6. This [WCJ] finds that Dr. Rutter was not credible, that his opinions were not legally competent, and that his opinions failed to address the accepted injuries. Dr. Rutter failed to review critical medical records in formulating his opinions. Additionally, his opinions were inconsistent. Dr. Rutter only examined Claimant once, specifically for this case and not to provide any treatment.

(WCJ's Decision, Mar. 6, 2019, at 13-14.) Based on these findings/conclusions and credibility determinations, the WCJ concluded that Claimant met his burden of proving that his November 25, 2015 work-related injury caused him to: (1) sustain "C6 radiculopathy, [a] herniated disc, acute nerve root lesions at or about the left

12

C6-[]7 nerve roots, cervical radiculopathy aggravated by the work injury, [a] post[]operative wound infection complicated with cervical hardware with [MSSA] and anaerobic gram-positive cocci, [a] left shoulder injury, and removal of hardware from C4-[]5 with placement of hardware at C4-[]7" (cervical injury); (2) be disabled beginning December 4, 2015, and continuing thereafter; and (3) sustain permanent and unsightly disfigurement to his neck that is not usual or incident to his employment. (*Id.* at 13-15.) Employer appealed to the Board, which affirmed the WCJ's decision.[4] Employer then petitioned this Court for review.

## II. ARGUMENTS ON APPEAL

On appeal,[5] Employer argues that the Board erred by affirming the WCJ's decision because: (1) the WCJ's finding that Claimant suffered a work-related cervical injury on November 25, 2015, is not supported by substantial evidence; and (2) the WCJ committed an error of law and/or abused his discretion by closing the record and precluding Employer from presenting rebuttal testimony relative to Claimant's ongoing disability.[6]

---

[4] The Board chose not to revisit the issues that Employer had already raised in its prior appeal. (Board's Decision, Feb. 5, 2020, at 9.) Instead, the Board relied upon its October 16, 2018 decision, wherein it previously addressed and rejected Employer's arguments relative to the competency of Dr. Knaub's testimony and the WCJ's decision to close the record without permitting Employer to present additional rebuttal testimony relative to Claimant's ongoing disability. (*Id.* at 8-9.) As a result, the Board's February 5, 2020 decision solely addresses Employer's challenge to the WCJ's award of disfigurement benefits. (*Id.* at 9-12.)

[5] Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Combine v. Workers' Comp. Appeal Bd. (Nat'l Fuel Gas Distrib. Corp.)*, 954 A.2d 776, 778 n.1 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 961 (Pa. 2009).

[6] We have condensed Employer's arguments for the purposes of discussion and disposition.

13

### III. DISCUSSION

#### A. *Substantial Evidence*

Employer's argument that the WCJ's finding that Claimant had suffered a work-related cervical injury on November 25, 2015, is not supported by substantial evidence is two-fold. First, Employer contends that Dr. Knaub's testimony was equivocal and incompetent and, therefore, cannot constitute substantial evidence to support the WCJ's finding that Claimant sustained a work-related cervical injury. In this regard, Employer suggests that Dr. Knaub rendered his opinion regarding the cause of Claimant's cervical injury without an adequate understanding of Claimant's prior medical history—*i.e.*, Dr. Knaub admitted that he did not review all of Claimant's previous medical records relative to the treatment of his cervical spine, including Dr. Kumar's office note/report, wherein Dr. Kumar recommended that Claimant undergo cervical spine surgery a month prior to the November 25, 2015 work-related incident. Employer further suggests that the foundation for Dr. Knaub's opinion regarding the severity of the preexisting condition of Claimant's cervical spine was inconsistent with the evidentiary record—*i.e.*, Dr. Knaub opined that, prior to the November 25, 2015 work-related incident, Claimant had treated intermittently for his cervical spine condition, Claimant had some "issues" with his cervical spine but they did not prevent him from working, and Claimant did not seek surgical treatment for his cervical spine condition, whereas the evidentiary record reveals that, prior to the November 25, 2015 work-related incident, Claimant "had undergone years of treatment for his cervical spine, was having trouble at work, especially with overhead tasks, and was seen by not one, but two, neurosurgeons . . . and surgery was recommended." (Employer's Br. at 16.) Second, Employer contends that, even assuming that

Dr. Knaub's testimony is unequivocal and competent, such testimony does not constitute substantial evidence to support the WCJ's finding that Claimant sustained a work-related cervical injury. More specifically, Employer argues that, given that there was no anatomical change between Claimant's September 2015 MRI and December 2015 MRI, Dr. Knaub's opinion relative to the cause of Claimant's cervical spine condition "hinged on his determination that [C]laimant's cervical pain increased" following the November 25, 2015 work-related incident. (*Id.* at 18.) Employer suggests that "a mere increase in pain is not the equivalent of a compensable aggravation [of a preexisting condition] or [a] new work[-]related injury," and, therefore, Dr. Knaub's testimony was insufficient to support Claimant's burden of proof. (*Id.* at 19.) In response, Claimant argues that Dr. Knaub's testimony is unequivocal and legally competent, and, therefore, when considered in conjunction with Claimant's testimony relative to the November 25, 2015 work-related incident, his lack of work restrictions prior thereto, and his increased pain and symptoms subsequent thereto, supports the WCJ's finding that Claimant sustained a work-related cervical injury on November 25, 2015.

At the outset, we note that it is well settled that the WCJ is the sole arbiter of credibility and evidentiary weight. *Womack v. Workers' Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 83 A.3d 1139, 1154 (Pa. Cmwlth.), *appeal denied*, 94 A.3d 1011 (Pa. 2014). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support a contrary

finding; if substantial evidence supports the WCJ's necessary findings, we may not disturb those findings on appeal. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143-44 (Pa. Cmwlth. 2004).

It is also well settled that, with respect to a claim petition, the claimant bears the burden of proving all elements necessary for an award. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Pursuant to Section 301(c)(1) of the Workers' Compensation Act,[7] an employee's injuries are compensable if they "(1) arise[] in the course of employment and (2) [are] causally related thereto." *ICT Group v. Workers' Comp. Appeal Bd. (Churchray-Woytunick)*, 995 A.2d 927, 930 (Pa. Cmwlth. 2010). Further, an employee must demonstrate that he is disabled as a consequence of the work-related injury. *Cromie v. Workmen's Comp. Appeal Bd. (Anchor Hocking Corp.)*, 600 A.2d 677, 679 (Pa. Cmwlth. 1991). Unequivocal medical evidence is required where it is not obvious that an injury is causally related to the work incident. *Id.* "The question of whether expert medical testimony is unequivocal[] and, thus, competent evidence to support factual determinations is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "In such cases, we review the testimony as a whole and may not base our analysis on a few words taken out of context." *Id.* "Taking a medical expert's testimony as a whole, it will be found to be equivocal if it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg Coll.)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). "[M]edical testimony is unequivocal if a medical expert testifies, after providing a foundation for the testimony, that, in his

---

[7] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

16

professional opinion, he believes or thinks a fact exists." *O'Neill v. Workers' Comp. Appeal Bd. (News Corp. Ltd.)*, 29 A.3d 50, 57 (Pa. Cmwlth. 2011).

In addition to this requirement that a medical expert's testimony be unequivocal, the medical expert's testimony also must reflect the expert's adequate understanding of the facts to be competent. *Sears, Roebuck & Co. v. Workmen's Comp. Appeal Bd.*, 409 A.2d 486, 490 (Pa. Cmwlth. 1979). In reviewing an expert's testimony on this basis, we must consider whether the expert "had sufficient facts before him upon which to express" his medical opinion. *Id.* A medical expert's opinion will be held to be incompetent only when the opinion is based solely on inaccurate or false information; when the record as a whole contains factual support for an expert's opinion, the opinion is not incompetent. *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001).

Here, Employer suggests that Dr. Knaub's testimony is incompetent and equivocal because it is inconsistent with the evidentiary record—*i.e.*, Dr. Knaub characterized Claimant's prior treatment for his cervical spine condition as "intermittent," whereas Employer would have characterized it as "years of treatment," and disregarded the fact that Claimant consulted with two neurosurgeons shortly before the November 25, 2015 work-related incident—and was rendered without an adequate understanding of Claimant's prior medical history—*i.e.*, Dr. Knaub was not aware that Dr. Kumar had recommended that Claimant undergo cervical spine surgery prior to the November 25, 2015 work-related incident. We disagree. There is simply no evidence of record to suggest that Dr. Knaub's opinion that Claimant sustained a work-related cervical injury on November 25, 2015, was based upon mere possibilities, that Dr. Knaub did not have sufficient facts before him upon which he could express such opinion, or that such opinion was

17

based upon inaccurate or false information. *See Kurtz*, 794 A.2d at 449; *Am. Contracting Enters., Inc.*, 789 A.2d at 396; *Sears, Roebuck & Co.*, 409 A.2d at 490.

Dr. Knaub did not render his opinion in a vacuum or ignore the fact that Claimant suffered from a preexisting cervical spine condition at the time of the November 25, 2015 work-related incident. Rather, Dr. Knaub specifically acknowledged that Claimant had previously treated for his cervical spine condition and thereafter explained how, in light of such treatment, he could conclude that Claimant sustained a work-related cervical injury on November 25, 2015. Dr. Knaub explained that, while Claimant may have had issues with his cervical spine prior to November 25, 2015, Claimant's cervical spine condition did not keep him from working or cause him to seek surgical intervention prior to November 25, 2015. Dr. Knaub even opined that, but for the November 25, 2015 work-related incident, he did not believe that Claimant would have required the March 18, 2016 surgery. Dr. Knaub's opinions are not in any way discredited by the fact that Claimant consulted two neurosurgeons—Dr. Kumar and Dr. Asdourian—shortly before the November 25, 2015 work-related incident, or by the fact that Dr. Knaub was not aware, prior to his deposition, that Dr. Kumar had recommended that Claimant undergo cervical spine surgery. First, while Dr. Kumar may have indicated that Claimant "may" need cervical spine surgery at some point "in the future" to treat his cervical spine condition, the surgery recommended by Dr. Kumar would have addressed C3-4, whereas the surgery performed by Dr. Knaub on March 18, 2016, addressed C4-7. Second, when Claimant consulted with Dr. Asdourian prior to the November 25, 2015 work-related incident, Dr. Asdourian did not believe that there was a problem with Claimant's cervical

18

spine that required surgery, and he discharged Claimant from his care, whereas, when Claimant returned to Dr. Asdourian following the November 25, 2015 work-related incident, Dr. Asdourian noted that Claimant was suffering from disabling neck pain and left arm paresthesia, took Claimant out of work, and recommended that Claimant receive epidural cervical injections. For these reasons, we cannot conclude that Dr. Knaub's testimony that Claimant sustained a work-related cervical injury on November 25, 2015, is equivocal or incompetent.

Employer further suggests that, even if Dr. Knaub's testimony is both unequivocal and competent, such testimony does not provide substantial evidence to support the WCJ's finding that Claimant sustained a work-related cervical injury on November 25, 2015, because Dr. Knaub's testimony/opinion that Claimant sustained a work-related cervical injury is based solely on the increase in pain that Claimant reported following the November 25, 2015 work-related incident. Again, we disagree. Claimant testified that, on November 25, 2015, while working for Employer, he stepped down from a ladder, got his feet wrapped up in some plastic that had been balled up and thrown into an access hole, and fell and struck his left shoulder and the left side of his head on the concrete floor/ground. Employer does not appear to contest the mechanism of Claimant's injury—*i.e.*, that the November 25, 2015 work-related incident actually occurred; rather, Employer appears to suggest, based on Dr. Rutter's testimony, that, because there was no anatomical change in Claimant's cervical spine condition following the November 25, 2015 work-related incident, that Claimant did not suffer a compensable injury.

Based upon the undisputed mechanism of injury described by Claimant, Claimant's medical records, and his physical examination of Claimant, Dr. Knaub

opined, with a reasonable degree of medical certainty, that Claimant sustained a work-related cervical injury on November 25, 2015. While Dr. Knaub may have conceded that his opinion relative to the exacerbation of Claimant's preexisting cervical condition was based upon Claimant's increase in pain following the November 25, 2015 work-related incident and that there was no anatomical change in Claimant's cervical spine between the September 18, 2015 and December 7, 2015 MRIs of Claimant's cervical spine, Dr. Knaub explained that a person with a preexisting spine condition can suffer an increase in pain following a trauma. Dr. Knaub's explanation relative to Claimant's need for additional treatment following a trauma that resulted in increased pain—*i.e.*, the November 25, 2015 work-related incident—is bolstered by the fact that, when Claimant consulted with Dr. Asdourian shortly before the November 25, 2015 work-related incident, Dr. Asdourian did not believe that Claimant required surgery to treat his cervical spine condition and he discharged Claimant from his care. When Claimant returned to Dr. Asdourian for a consultation following the November 25, 2015 work-related incident, however, Dr. Asdourian recommended that Claimant undergo epidural cervical injections. The change in Dr. Asdourian's treatment recommendations certainly supports Dr. Knaub's opinion that the condition of Claimant's preexisting cervical spine condition worsened, or was aggravated by, the November 25, 2015 work-related incident. For all of these reasons, we cannot conclude that Dr. Knaub's testimony, when considered with Claimant's testimony relative to the mechanism of his injury and his increase/change in pain, both of which the WCJ found credible, does not constitute substantial evidence to support the WCJ's finding that Claimant sustained a work-related cervical injury on November 25, 2015.

20

*B. Rebuttal Testimony*

Employer argues that the WCJ committed an error of law and/or abused his discretion by closing the record and precluding Employer from presenting additional rebuttal testimony relative to Claimant's ongoing disability—*i.e.*, Claimant's alleged operation of a business during a time when Claimant testified he was unable to work and was without earnings. Employer contends that, by doing so, the WCJ violated Section 131.53 of the Special Rules of Administrative Practice and Procedure Before WCJs (Special Rules).[8] In response, Claimant contends that the WCJ did not commit an error of law and/or abuse his discretion because Employer had sufficient opportunity to present any such rebuttal evidence and was not prejudiced by the WCJ's decision to close the record. In this regard, Claimant suggests that, by the time of Employer's request to present additional rebuttal evidence, Claimant's claim petition had already been pending for more than 15 months, thus affording Employer ample opportunity to investigate Claimant's claim including ongoing disability, and Employer's counsel had already cross-examined Claimant on numerous occasions. Claimant further suggests that the issue that Employer seeks to raise through the rebuttal testimony—*i.e.*, Claimant's alleged wages—is an issue that Employer can raise at any time in the future by filing a petition to suspend/modify Claimant's benefits.

The purpose of the Special Rules "is to promote, consistent with fairness and due process, the orderly and expeditious determination of proceedings before [WCJs] . . . to implement the remedial intent of the [Workers' Compensation Act[9]]." 34 Pa. Code § 131.1. Section 131.53 of the Special Rules, which addresses

---

[8] 34 Pa. Code § 131.53.

[9] 77 P.S. §§ 1-1041.4, 2501-2710.

procedures subsequent to the first hearing, provides, in pertinent part, that "[a] party wishing to present testimony in the form of rebuttal or surrebuttal shall notify the [WCJ] in writing within 21 days after conduct of the hearing or deposition at which the testimony to be rebutted or surrebutted has been given." 34 Pa. Code § 131.53(e). "Following [such] a request . . . , the testimony shall be presented at a hearing or deposition[,] provided the testimony shall be taken no later than 45 days after the conclusion of the case of the party presenting the testimony or evidence to be rebutted or surrebutted." 34 Pa. Code § 131.53(f). A WCJ may, however, "for good cause, waive or modify a provision of [the Special Rules] . . . upon motion of a party, agreement of all parties[,] or upon the [WCJ's] own motion." 34 Pa. Code § 131.3(a).

In addition, with respect to closure of the evidentiary record, Section 131.101(c) of the Special Rules provides, in relevant part, that "[t]he evidentiary record is closed when the parties have submitted all of their evidence and rested or when the [WCJ] has closed the evidentiary record on a party's motion or the [WCJ's] own motion." 34 Pa. Code § 131.101(c). "A [WCJ] may close the evidentiary record on the [WCJ's] own motion even if all parties have not rested when the [WCJ] determines that the parties have had reasonable opportunity to present their case, provided that reasonable notice of the closing of the evidentiary record has been given to all parties." 34 Pa. Code § 131.101(e); *see also Wagner v. Workers' Comp. Appeal Bd. (Ty Constr. Co., Inc.)*, 83 A.3d 1095, 1098 (Pa. Cmwlth. 2014) (noting that "WCJ may close the record and preclude the submission of evidence, provided he first warns the parties that the record will close").

By arguing that the WCJ committed an error of law and/or abused his discretion by closing the record and precluding Employer from presenting additional rebuttal testimony relative to Claimant's ongoing disability, Employer ignores some important key facts. Claimant filed his claim petition on December 22, 2015. After holding numerous hearings, at which Employer arguably would have had the opportunity to present evidence relative to Claimant's ongoing disability, the WCJ closed the record and issued a briefing schedule. Subsequent thereto, Employer requested that the record be reopened so that Employer could present testimony relative to an allegation that Claimant had been working during a period of time when Claimant claimed to be disabled. The WCJ granted Employer's request and scheduled a hearing for April 6, 2017, at which, Employer's counsel cross-examined Claimant and presented the testimony of Dawn Chamberlain. At the conclusion of that hearing, Employer requested that the WCJ schedule an additional hearing so that Employer could present the testimony of more fact witnesses relative to Claimant's ongoing disability. After indicating that he would take the matter under advisement, the WCJ ultimately denied Employer's request and issued his decision on July 6, 2017. Given that the WCJ reopened the record at Employer's request in an effort to give Employer the opportunity to present its later-acquired evidence relative to Claimant's ongoing disability, which he was not required to do, we cannot criticize the WCJ for reclosing the record when he did. Employer could have had the additional fact witnesses present and ready to testify at the April 6, 2017 hearing, but it chose not to do so. For these reasons, we cannot conclude that the WCJ committed an error of law and/or abused his discretion by closing the record and precluding Employer from presenting additional rebuttal testimony relative to Claimant's ongoing disability.

23

## IV.  CONCLUSION

Accordingly, we affirm the Board's order.

_____

P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Monacacy Valley Electric, Inc.,     :
               Petitioner     :
                                  :
        v.                    :    No. 244 C.D. 2020
                                    :
Workers' Compensation Appeal      :
Board (Walker),                   :
               Respondent    :

# **O R D E R**

AND NOW, this 20th day of April, 2021, the order of the Workers' Compensation Appeal Board, dated February 5, 2020, is hereby AFFIRMED.

_____

P. KEVIN BROBSON, Judge
