# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Davita, Inc., :
                   Petitioner :
                           :
      v. : No. 1207 C.D. 2020
                           : Submitted: June 11, 2021
Lisa Rogers (Workers' :
Compensation Appeal Board), :
               Respondent :

BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY PRESIDENT JUDGE BROBSON**          **FILED: November 9, 2021**

Davita, Inc. (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board), dated October 29, 2020. The Board affirmed the decision of a Workers' Compensation Judge (WCJ), granting the claim petition filed by Lisa Rogers (Claimant) and denying the termination petition filed by Employer. For the reasons set forth below, we affirm the Board's order.

## I. BACKGROUND

Claimant worked for Employer as a registered nurse/clinical coordinator. On January 26, 2018, Claimant sustained a work-related injury in the nature of a lumbar sprain. Employer accepted liability for Claimant's work-related injury pursuant to an Amended Notice of Temporary Compensation Payable, which was subsequently converted to a Notice of Compensation Payable (NCP) by operation of law. Thereafter, on October 10, 2018, Claimant filed a claim petition, asserting that she had sustained a lumbar spine injury, a cervical injury, and a thoracic injury while

working for Employer on January 26, 2018, and that she was totally disabled as a result thereof as of January 28, 2018.[1]  Subsequent thereto, on February 25, 2019, Employer filed a termination petition, asserting that Claimant had fully recovered from her work-related injury as of January 10, 2019.

In support of her claim petition, Claimant testified before the WCJ at the hearing held on February 6, 2019.  Claimant testified that, on January 26, 2018,[2] as she was walking into Ephrata Hospital, one of five different hospitals where she performed inpatient dialysis for Employer, her foot did not clear the curb and she started to fall facedown.  (R.R. at 85a.)  To avoid falling onto her face, Claimant twisted her body, which caused her to strike her right knee, right foot, left low back, and left hip on the ground.  (*Id.* at 85a-86a.)  Despite her fall, Claimant worked her complete shift that day.  (*Id.* at 86a.)  The next day, she treated at Hanover Hospital for complaints of low back pain, right knee pain, and right foot pain, and the emergency room medical staff provided her with a work restriction and released her with instructions to follow up with her family doctor.  (*Id.* at 86a-87a.)  Claimant followed up with her family doctor on January 30, 2018, complaining of low back pain that was worse on the right and that radiated up her right side into her neck, right knee pain, and right foot pain.  (*Id.* at 87a-88a.)  Sometime thereafter, at

---

[1] In her claim petition, Claimant also alleged that, on May 10, 2018, her left leg "gave out on her" because of her January 26, 2018 work-related low back injury, causing her to sustain a fractured left ankle.  Claimant, however, withdrew her claim that her fractured left ankle was related to the January 26, 2018 work-related incident at the time of the February 6, 2019 hearing before the WCJ.

[2] There appears to be a discrepancy in the record regarding the date on which Claimant sustained her work-related injury.  Claimant testified that the work-related incident occurred on January 27, 2018, whereas the NCP, claim petition, and termination petition identify the date of injury as January 26, 2018.  (*See* Reproduced Record (R.R.) at 5a, 23a, 80a, 85a, 245a.)  Given that the operative documents identify January 26, 2018, as the date of Claimant's work-related injury, we will use that date throughout this opinion.

Employer's direction, Claimant also treated with Concentra. (*Id.* at 88a.) In order to treat Claimant's injuries, the medical providers at Concentra prescribed Claimant muscle relaxers and pain medication, ordered a magnetic resonance imaging (MRI) of Claimant's lumbar spine, imposed light-duty work restrictions, and referred Claimant to WellSpan Neurosurgery (WellSpan). (*Id.* at 88a-89a.)

Claimant first treated at WellSpan on March 15, 2018, with Melissa Miller (Nurse Miller), a nurse practitioner. (*Id.* at 90a.) At that time, Claimant complained of low back pain that radiated down her right leg and up into her neck. (*Id.* at 90a-91a.) Claimant explained that, by the time of her first visit with Nurse Miller, her right knee and right foot "were no longer an issue." (*Id.* at 90a.) To treat Claimant's injuries, Nurse Miller ordered a bone scan and an electromyography (EMG) of Claimant's right leg and referred Claimant for pain management. (*Id.* at 91a-93a.) When she returned to WellSpan following the EMG, Claimant treated with Pawel Ochalski, M.D. (*Id.* at 93a.) At that time, Dr. Ochalski ordered MRIs and computerized tomography (CT) scans of Claimant's lumbar to cervical spine. (*Id.* at 94a.) Claimant indicated that she has continued to treat regularly with Dr. Ochalski since that time and that Dr. Ochalski's treatment plan includes surgery for her cervical spine and physical therapy for her low back. (*Id.* at 95a.) Claimant admitted, however, that except for one session, she has not attended physical therapy. (*Id.* at 107a-08a, 117a.)

Claimant testified further that, prior to the January 26, 2018 work-related incident, she sought treatment on various occasions for injuries to her low back and neck. (*Id.* at 96a.) She explained that, in 2003 or 2005, she injured her low back while shoveling snow and treated with her family doctor. (*Id.* at 96a-97a.) Then, in 2015, she fell off a horse and injured her neck. (*Id.* at 97a, 105a.) Following the

3

fall, she treated at Hanover Hospital and Hershey Medical Center for a concussion and neck pain and underwent a CT scan of her neck. (*Id.* at 105a-06a, 114a.) Thereafter, in 2016, Claimant treated with her family doctor for neck pain after an aggressive patient "yanked" on her arm. (*Id.* at 96a-98a.) Claimant did not, however, recall treating with an orthopedist for her low back or neck or undergoing physical therapy for her low back prior to the January 26, 2018 work-related incident. (*Id.* at 106a-07a.) Claimant also did not recall being previously diagnosed with arthritis or degenerative disc disease in her cervical, thoracic, and/or lumbar spine or complaining of low back pain that radiated down her right leg or pain and numbness in her hands and feet prior to the January 26, 2018 work-related incident. (*Id.* at 110a-11a, 113a.) In addition, while she admitted that she has treated with a chiropractor in the past, Claimant testified that those treatments were not related to any pain complaints. (*Id.* at 106a-07a.)

Despite these prior injuries, Claimant did not have any problems with her neck or low back that prevented her from working or performing the duties of her position with Employer from April 18, 2016, when she started working for Employer, to January 26, 2018, when she sustained the work-related injury. (*Id.* at 99a.) Since the time of the January 26, 2018 work-related injury, however, Claimant has been unable to perform her normal household activities. (*Id.* at 101a-02a.) Claimant indicated that she has also been unable to drive because Dr. Ochalski restricted her from driving. (*Id.* at 102a.) Claimant testified further that she continues to take Flexeril and OxyContin for her low back and neck condition. (*Id.* at 125a-26a.) She also continues to perform exercises—*i.e.*, leg lifts and stretches—every four hours at home. (*Id.* at 126a-27a.)

4

Claimant further admitted that, on May 10, 2018, she was at the Hanover Hotel for a "moms' night out," when she suffered a fall and fractured her left ankle. (*Id.* at 118a-21a.) She explained that she put her left leg up on the wall outside the bathroom to scratch a rash, when her right leg "gave out," causing her to fall on the floor on top of her left ankle. (*Id.* at 120a-21a.) Claimant also admitted that, prior to the fall, she had consumed a couple of alcoholic drinks. (*Id.* at 119a.)

Claimant also presented the deposition testimony of Dr. Ochalski, who is a board-certified neurological surgeon that mainly treats degenerative, traumatic, and other conditions of the spine. (*Id.* at 150a.) Dr. Ochalski testified that Claimant first treated at WellSpan on March 15, 2018, with Nurse Miller. (*Id.* at 151a.) At that time, Claimant reported to Nurse Miller that, following the January 26, 2018 work-related incident, she began to experience low back pain, leg pain, and neck pain. (*Id.*) Nurse Miller performed an evaluation, which revealed proximal leg weakness, elements of lumbar radiculopathy, and neck pain. (*Id.* at 153a-54a.) Nurse Miller referred Claimant to Hillside Pain Management in an attempt to conservatively manage Claimant's "lumbar mediated pain." (*Id.* at 154a.) When she returned to Nurse Miller in April 2018, however, Claimant reported no relief from the epidural steroid injection that she had received from Hillside Pain Management. (*Id.* at 154a-55a.) In an effort to further evaluate Claimant's potential candidacy for surgery, Nurse Miller ordered a single-photon emission computerized tomography (SPECT) scan of Claimant's lumbar spine and an EMG of Claimant's right lower extremity. (*Id.* at 155a.) Claimant returned to Nurse Miller again on July 16, 2018; on that date, Claimant reported that, since the time of her last visit with Nurse Miller, she had sustained a right ankle fracture. (*Id.* at 155a-56a.)

When Claimant returned to WellSpan on September 5, 2018, Claimant was evaluated by Dr. Ochalski. (*Id.* at 156a.) At that time, Dr. Ochalski performed a physical examination, which revealed "weakness on [Claimant's] right side[,] . . . asymmetry in her reflexes with hyperreflexia noted on the right side compared to the left, and . . . a very unsteady gait with very small steps requiring assistance." (*Id.* at 156a-57a.) Dr. Ochalski reviewed both the MRI of Claimant's lumbar spine and the EMG of Claimant's right lower extremity. (*Id.* at 157a.) He confirmed that the MRI of Claimant's cervical spine revealed degenerative changes. (*Id.*) He further explained that "[t]he EMG disclosed some nerve irritation potentially in the peripheral nervous system around the perineal nerve, but what was most concerning to [him] was the fact that [Claimant] had a level of disability and functional impairment that was out of proportion to what [they] were seeing in the low back and [he was] concerned . . . about a potential underappreciated problem higher up in the nervous system, particularly in the cervical spine." (*Id.*) Dr. Ochalski diagnosed Claimant with "some element of lumbar radiculopathy" and "myelopathy in the cervical or thoracic region," and he recommended that Claimant undergo MRIs of both her cervical and thoracic spine. (*Id.* at 157a-58a.) Dr. Ochalski did not believe that Claimant was capable of returning to work. (*Id.* at 158a.)

Dr. Ochalski testified further that the MRI of Claimant's cervical spine revealed "multiple disc herniations that were essentially abutting and indenting the spinal sac and causing some impression on the spinal cord," as well as degenerative disc disease at multiple levels. (*Id.* at 158a-59a, 213a.) Dr. Ochalski explained that, while the MRI also revealed osteophytes, or bone spurs, at multiple levels that were indenting Claimant's spinal cord, "the bone spurs [were] not the leading part of that compression"; rather, "the leading part of [the] compression [was] disc material."

6

(*Id.* at 214a-15a.) Dr. Ochalski also indicated that "despite the complexity of [Claimant's] case[,] . . . [Claimant] had . . . physical [examination] findings [that were] early indicators of myelopathy, and [that] . . . the MRI bore out some of [their] initial concerns." (*Id.* at 160a.) When questioned whether complaints similar to those reported by Claimant—*i.e.*, lumbar pain and leg weakness—could be confused with lumbar radiculopathy, Dr. Ochalski explained:

> I think that [Claimant] presented basically with two injuries. One was localized to her low back resulting in back pain and some element of nerve root irritation. Those types of injuries are -- again, this is my impression, but those types of injuries are more consciously [sic] and people are more aware of them and can more easily localize those types of injuries, and that's why I believe that she was more expressive of that problem, which I believe she had. She certainly, no doubt, had a back injury.

> As time went on and as back injuries go, they typically heal with conservative management and strategies, and she has demonstrated some ability to heal that injury, and that would be expected with the findings on the imaging studies. What I also believe she had at the time of her injury was a stretch of the spinal cord, a mild or at least an early spinal cord injury called a central cord injury that resulted in weakness of the gross muscle groups that we know the spinal cord controls.

> The physical exam findings that can go back all the way to her family doctor and to [Nurse Miller's] findings of leg -- proximal leg weakness cannot be explained by her lumbar MRI and can only be explained by the findings on the cervical imaging, and so that has to be taken into account when looking at the entire picture of understanding why this individual would initially present with back pain and focal leg pain but never really explain why she's having proximal leg weakness and asymmetry in her reflexes. And until we image that part of the spine, we've finally disclosed that, you know, aspect of her case that heretofore wasn't explained with any -- you know, anybody really making a good analysis of that.

(*Id.* at 160a-62a.) In order to treat Claimant's cervical myelopathy, Dr. Ochalski scheduled an anterior surgery to decompress Claimant's spinal cord and to correct

7

the curvature of her spine, which was to be followed by Claimant's use of a brace to prevent further deterioration of her spinal cord dysfunction. (*Id.* at 164a.)

Ultimately, Dr. Ochalski opined within a reasonable degree of medical certainty that all of his diagnoses, as well as Claimant's medical treatment including the scheduled decompression surgery, are causally related to the January 26, 2018 work-related incident. (*Id.* at 164a-65a.) Dr. Ochalski further opined that, with respect to the injury to Claimant's lumbar spine—*i.e.*, lumbar sprain/strain and lumbar radiculopathy—Claimant has reached maximum medical improvement, but she continues to suffer from and requires further treatment for the cervical myelopathy and central cord syndrome. (*Id.* at 166a-67a.) While he admitted that Claimant's medical records indicated that Claimant had suffered from low back and neck issues prior to the January 26, 2018 work-related incident, Dr. Ochalski indicated that those medical records did not change the opinions that he rendered regarding the cause of Claimant's injuries. (*Id.* at 167a.) Rather, he explained that those prior issues "fit into [his] opinion that [Claimant's] work injury aggravated [her] preexisting conditions and that those preexisting conditions predispose[d] her to developing the injury that she sustained relative to her spinal cord and [lumbar] nerve roots." (*Id.*)

On cross-examination, Dr. Ochalski admitted that, while he supervised Nurse Miller during her evaluation of Claimant, he did not himself examine Claimant until after the May 10, 2018 fall at the Hanover Hotel that resulted in the severe fracture of Claimant's left ankle. (*Id.* at 171a-72a, 178a-80a.) Nevertheless, other than her inability to fully ambulate, Dr. Ochalski did not believe that Claimant's May 10, 2018 fall in any way contributed to the symptoms that she was experiencing on September 5, 2018. (*Id.* at 181a.) When questioned whether Claimant's cervical

8

myelopathy existed prior to the January 26, 2018 work-related incident, Dr. Ochalski explained:

> What I believe existed at the time of [Claimant's work-related] fall was some element of cervical spondylosis, which is a generic term for disc bulging, disc, you know, degenerative changes, and joint changes. That I'm pretty sure preexisted her fall as evidenced by the fact that she's had previous complaints of neck pain although were incompletely worked up at the time of those complaints and those structural changes, particularly the reversal of her normal cervical curvature that stretched the spinal code [sic] predisposed her to not only worsening -- to developing a central cord syndrome and some -- and progressive myelopathy, but I do not believe at least that anyone had diagnosed her with preexisting cervical myelopathy.

(*Id.* at 182a-83a.)

Dr. Ochalski further admitted that he "was impressed with the fact that someone could fracture [her] ankle from a ground-level fall" and that it was "certainly possible" that Claimant could have injured her neck and low back as a result of the May 10, 2018 fall. (*Id.* at 185a.) When questioned whether Claimant's cervical pain complaints began before or after the May 10, 2018 fall, Dr. Ochalski indicated that Claimant had reported neck pain, neck stiffness, and leg/motor weakness to both Nurse Miller and her family doctor prior to the May 10, 2018 fall; he explained that there was a delay in connecting those symptoms with a diagnosis of cervical myelopathy because Claimant and her medical providers initially attributed her leg weakness to her lumbar spine rather than her spinal cord compression. (*Id.* at 189a-98a.) Dr. Ochalski admitted, however, that while Claimant had expressed symptomatic complaints relative to her neck issues, no formal diagnosis had been offered by WellSpan's medical practitioners with respect to Claimant's neck condition as of March 15, 2018. (*Id.* at 198a-99a.) Dr. Ochalski also admitted that WellSpan's office notes from April 23, 2018, do not include any

9

complaints of neck pain or neck stiffness but that those complaints were noted again after Claimant's May 10, 2018 fall. (*Id.* at 199a.)

Dr. Ochalski also admitted that he did not review all of Claimant's medical records from her primary care physician prior to his deposition. (*Id.* at 200a-06a.) Dr. Ochalski acknowledged that those medical records demonstrate that, prior to the January 26, 2018 work-related incident, Claimant had been suffering from chronic back pain and degenerative changes in her cervical, thoracic, and lumbar spine. (*Id.* at 201a-06a.) Dr. Ochalski explained, however:

> It wouldn't surprise me [if] someone with her condition . . . had back pain [with] intermittent flare-ups.
>
> . . . .
>
> [M]any patients that we encounter with work injuries, it's not uncommon for them to have a preexisting back condition, and the fact is I don't -- her MRI shows, you know, moderate degenerative changes.
>
> . . . [Y]ou reference a very typical patient with her MRI as having some preexisting degenerative changes, which again only predisposes her to aggravating those changes with the type of fall that she had.

(*Id.* at 201a-02a.) Dr. Ochalski further admitted that Claimant did not make him aware that, in October 2015, she suffered from a concussion and neck pain following a fall from a horse or that, in May 2016, she was suffering from neck pain and underwent trigger point injections. (*Id.* at 206a.) Dr. Ochalski indicated that he did not address Claimant's driving status at any of his office visits. (*Id.* at 225a.) When questioned if he could distinguish whether the scheduled surgery was the result of the January 26, 2018 work-related incident or the May 10, 2018 non-work-related fall, Dr. Ochalski explained that "there were elements of myelopathy that predated her fall that resulted in the ankle [fracture] and that there are some symptoms that have . . . worsened since that fall in May." (*Id.* at 229a-30a.)

10

In opposition to Claimant's claim petition and in support of its termination petition, Employer presented the deposition testimony of Walter Peppelman, Jr., D.O., who is board certified in both orthopedic surgery and spine surgery. (*Id.* at 256a.) Dr. Peppelman performed an independent medical examination (IME) of Claimant on January 10, 2019, which included obtaining a history, performing a physical examination, and reviewing Claimant's medical records and diagnostic studies. (*Id.* at 259a-75a.) Dr. Peppelman indicated that his physical examination revealed no objective evidence of any neurologic abnormalities that would correspond with Claimant's subjective complaints. (*Id.* at 270a-71a.) He also indicated that Claimant's diagnostic tests—specifically, the EMGs of her upper and lower extremities, the MRI of her cervical spine, the MRI of her thoracic spine, the MRI of her lumbar spine, and the bone scan—were all within normal limits and revealed degenerative changes with no acute findings or any evidence of neuropathy or radiculopathy, significant abnormalities within the nerves, or significant compression of either the spinal cord or the exiting nerves. (*Id.* at 272a-81a.)

Based upon the results of his IME, Dr. Peppelman opined within a reasonable degree of medical certainty that, as a result of the January 26, 2018 work-related incident, Claimant sustained a lumbar sprain/strain. (*Id.* at 282a-83a.) Dr. Peppelman did not, however, believe that Claimant sustained any additional injuries as a result of the January 26, 2018 work-related incident, including, but not limited to, lumbar radiculopathy, cervical myelopathy, and/or central cord compression/syndrome. (*Id.* at 284a-85a, 289a-90a.) Dr. Peppelman explained that there is no objective evidence of spinal cord impingement or cervical myelopathy and Claimant's initial subjective complaints were not consistent with an injury to her cervical spine. (*Id.* at 285a-91a.) Dr. Peppelman admitted, nevertheless, that

11

Claimant had complained of pain that radiated into her neck at the time of her January 30, 2018 office visit with her family doctor and that leg weakness can be a symptom of cervical myelopathy. (*Id.* at 301a-02a.) Dr. Peppelman further opined that, as of January 10, 2019, the date of his IME, Claimant had reached maximum medical improvement, had fully recovered from and required no further treatment for her January 26, 2018 work-related injury, and was capable of returning to work in her pre-injury position with Employer. (*Id.* at 293a-95a.) Dr. Peppelman also did not believe that the cervical spine decompression with stabilization surgery recommended by Dr. Ochalski was reasonable or necessary to treat Claimant's January 26, 2018 work-related injury. (*Id.* at 266a, 294a.)

Employer also offered the deposition testimony of Jason Beddia (Mr. Beddia), a paramedic, and William Lawver (Mr. Lawver), an emergency medical technician. Mr. Beddia and Mr. Lawver testified that, on May 10, 2018, they were dispatched to the Hanover Hotel, where they found Claimant in the vestibule outside the bathroom near the bar area with a fractured left ankle with obvious deformity. (*Id.* at 358a-59a, 361a, 387a, 389a.) At that time, Claimant reported that the injury had occurred when she put her leg up to scratch a rash and fell. (*Id.* at 360a.) Mr. Beddia and Mr. Lawver explained that, while Claimant admitted to having consumed four margaritas that night, Claimant did not appear intoxicated—*i.e.*, she may have been impaired, but her speech was not slurred, she was coherent, she was able to answer all of Mr. Beddia's and Mr. Lawver's questions, and there was no odor of alcohol on her breath. (*Id.* at 360a-64a, 390a-91a.)

By decision and order dated August 29, 2019, the WCJ granted Claimant's claim petition and denied Employer's termination petition. In so doing, the WCJ made the following relevant factual findings and credibility determinations:

12

14. . . . I have not given any weight to Mr. Beddia's testimony. There is no dispute that . . . Claimant fell and fractured her ankle on May 10, 2018.

15. . . . I have not given any weight to Mr. Lawver's testimony. There is no dispute that . . . Claimant fell and fractured her ankle on May 10, 2018.

. . . .

23. I accept as credible and persuasive . . . Claimant's testimony. I found . . . Claimant to be a credible witness when she testified before me at the February 6, 2019 hearing. . . . Claimant admitted that she had prior problems, symptoms[,] and treatment for her low back and neck. . . . Claimant's history of pain in her neck following the work-related fall on or about January 26, 2018[,] is consistent with the medical records and opinion of Dr. Ochlaski [sic]. Dr. Peppelman acknowledged that . . . Claimant complained of pain radiating to her neck at the January 30, 2018 visit [with] her family doctor.

24. I accept as credible and persuasive the medical opinions of Dr. Ochalski and find that . . . Claimant's January 26, 2018 fall at work resulted in lumbar radiculopathy, lumbar strain, cervical myelopathy[,] and central cord compression that resulted in the surgery performed by Dr. Ochalski on April 15, 2019. Dr. Ochalski's opinion is credible and persuasive because he is . . . Claimant's treating doctor. He has had the opportunity to treat and examine . . . Claimant on multiple occasions. Furthermore, Dr. Ochalski's opinion is consistent with the medical records in January of 2018 and February of 2018 that confirm that . . . Claimant was complaining of pain radiating to her neck. Dr. Ochalski's testimony is consistent with . . . Claimant's leg weakness following the fall at work on January 26, 2018. Dr. Peppelman acknowledged that . . . Claimant complained of pain radiating to her neck at the January 30, 2018 visit with her family doctor. Dr. Peppelman acknowledged that a symptom of cervical myelopathy is leg weakness. Dr. Ochalski explained how . . . Claimant's pre[]existing changes in her neck made her more vulnerable to cervical myelopathy and central cord compression as a result of her January 26, 2018 fall. Dr. Ochalski explained how the symptoms associated with cervical myelopathy and central cord compression continued from her fall at work on

January 26, 2018[,] through and after her May 10, 2018 fall at Hanover Hotel.

25. I reject as not credible and not persuasive the medical opinion of Dr. Peppelman. He only examined . . . Claimant on one occasion. He acknowledged that . . . Claimant had pain radiating to her neck at the January 30, 2018 office visit with her family doctor. He acknowledged that an element of cervical myelopathy was leg weakness.

(WCJ's Decision 4, 7-8.) Based on these relevant factual findings and credibility determinations, the WCJ essentially concluded: (1) Claimant met her burden of proving that, in addition to a lumbar sprain, she also sustained a lumbar strain, lumbar radiculopathy, cervical myelopathy, and central cord compression as a result of the January 26, 2018 work-related incident; and (2) Employer did not meet its burden of proving that Claimant had fully recovered from her January 26, 2018 work-related injury. Employer appealed to the Board, which affirmed the WCJ's decision. Employer then petitioned this Court for review.

## II. ARGUMENTS ON APPEAL

On appeal,[3] Employer essentially argues that the Board erred by affirming the WCJ's decision because: (1) the WCJ's finding that Claimant sustained a lumbar sprain, a lumbar strain, lumbar radiculopathy, cervical myelopathy, and central cord compression as a result of the January 26, 2018 work-related incident is not supported by substantial evidence of record;[4] and (2) Employer met its burden of

_____

[3] Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Combine v. Workers' Comp. Appeal Bd. (Nat'l Fuel Gas Distrib. Corp.)*, 954 A.2d 776, 778 n.1 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 961 (Pa. 2009).

[4] Throughout its brief, Employer suggests that the WCJ "arbitrarily and capriciously disregarded" certain evidence—*i.e.*, the facts and circumstances surrounding Claimant's subsequent, intervening, non-work-related fall on May 10, 2018, including the independent testimony of Mr. Beddia and Mr. Lawver, Claimant's alleged untruthful statements under oath, and the credible and competent testimony of Dr. Peppelman—and that, had the WCJ properly

14

proving that Claimant had fully recovered from her January 26, 2018 work-related injury as of January 10, 2019.

## III.  DISCUSSION

### A.  Substantial Evidence – Claim Petition

Employer argues that the Board erred by affirming the WCJ's decision to grant Claimant's claim petition because the WCJ's finding that, in addition to the accepted lumbar sprain, Claimant also sustained a lumbar strain, lumbar radiculopathy, cervical myelopathy, and central cord compression as a result of the January 26, 2018 work-related incident is not supported by substantial evidence. More specifically, Employer contends that the WCJ did not give proper weight to the facts and circumstances surrounding Claimant's subsequent, intervening, non-work-related fall on May 10, 2018, including that Claimant felt well enough to have a "moms' night out," that Claimant had been drinking prior to the fall, and that the fall was significant enough to cause Claimant to sustain a fractured left ankle. Employer further contends that Dr. Ochalski's testimony in support of the expansion of Claimant's injury description to include cervical myelopathy and a central cord compression/injury was incompetent and equivocal because:  (1) Dr. Ochalski did not initially review Claimant's medical records from her primary care physician and,

considered this evidence, the WCJ would have denied Claimant's claim petition.  Given, however, that Employer has framed its arguments not in terms of a deliberate disregard of such evidence but, rather, in terms of witness credibility and evidentiary weight, we will treat Employer's argument as one of substantial evidence.  Nevertheless, even if Employer did raise a capricious disregard argument, that argument is rejected.  A capricious disregard of evidence only occurs when the WCJ deliberately ignores relevant, competent evidence. *Capasso v. Workers' Comp. Appeal Bd. (RACS Assocs., Inc.)*, 851 A.2d 997, 1002 (Pa. Cmwlth. 2004).  Here, there is absolutely no indication that the WCJ deliberately ignored the testimony of Dr. Peppelman, Mr. Beddia, or Mr. Lawver.  Rather, the WCJ specifically addressed and summarized such testimony in his decision, demonstrating that the WCJ considered but rejected it as not credible and/or relevant to his decision.

15

when he did, he conceded that those records established that Claimant complained of chronic back pain and had degenerative changes in her cervical, thoracic, and lumbar spine prior to the January 26, 2018 work-related incident; (2) Dr. Ochalski was unaware that Claimant suffered from a concussion and neck pain following a fall from a horse in October 2015; (3) Claimant did not inform Dr. Ochalski that she underwent trigger point injections for neck pain in May 2016; and (4) "Dr. Ochalski admitted that he could not unequivocally state how Claimant's neck injury occurred" and that "it was 'certainly possible' [that] Claimant's neck injuries were the result of her fall in May 2018." (Employer's Br. at 30.) Employer also argues that Claimant herself was not credible because her "false testimony[—relative to prior complaints and diagnoses and alleged driving restriction—was] directly contradicted by every other person who testified in this case." (*Id.* at 33.) Employer further contends that the reasoning behind the WCJ's determination that Dr. Peppelman's opinions were not credible or persuasive is flawed because it misstates and, as a whole, ignores Dr. Peppelman's competent testimony. Employer suggests that, "by determining the credibility of Dr. Peppelman on the fact that he only examined Claimant once," the WCJ "reverse[d] the burden of proof for a claim/review petition and create[d] an insurmountable hurdle that . . . [E]mployer [could] never overcome, thereby depriving [E]mployer of its constitutional right to due process." (*Id.* at 36-37.)

In response, Claimant argues that the WCJ properly granted her claim petition because she met her burden of establishing that, in addition to the accepted lumbar sprain, she also sustained a lumbar strain, lumbar radiculopathy, cervical myelopathy, and central cord compression as a result of the January 26, 2018 work-related incident. Claimant further contends that it was well within the WCJ's

16

purview to not give any weight to the facts and circumstances surrounding her non-work-related fall on May 10, 2018, and/or to accept or reject her testimony as credible or not credible. Claimant also contends that, contrary to Employer's contentions, Dr. Ochalski's testimony is internally consistent, because he explained on both direct and extensive cross-examination how the January 26, 2018 work-related incident caused Claimant to sustain central cord compression and cervical myelopathy, how Claimant's preexisting cervical problems predisposed her to cervical myelopathy, and how Claimant's complaints of foot numbness and tingling could only be explained by lumbar radiculopathy stemming from the L5 or S1 nerve root. Lastly, Claimant argues that the WCJ did not err by basing his credibility determinations, at least in part, on the number of times that Claimant was seen by Dr. Ochalski and Dr. Peppelman, because Employer's argument to the contrary "flies in the face of [the] prior holdings of this Court [establishing] that the opinions of a treating healthcare provider may be entitled to greater weight than the testimony of a specialist who examines an employee only for the purpose of giving testimony." (Claimant's Br. at 11.)

At the outset, it is well settled that the WCJ is the ultimate finder of fact in workers' compensation proceedings. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143 (Pa. Cmwlth. 2004). As fact-finder, matters of credibility, conflicting medical evidence, and evidentiary weight are within the WCJ's exclusive province. *Id.* If the WCJ's findings are supported by substantial evidence, they are binding on appeal. *Agresta v. Workers' Comp. Appeal Bd. (Borough of Mechanicsburg)*, 850 A.2d 890, 893 (Pa. Cmwlth. 2004). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must simply

17

determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support contrary findings; the relevant inquiry is whether substantial evidence supports the WCJ's necessary findings. *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

It is also well settled that "[i]n a proceeding on a claim petition, the claimant bears the burden of establishing a work-related injury rendering the claimant incapable of performing the time-of-injury job." *Vista Int'l Hotel v. Workmen's Comp. Appeal Bd. (Daniels)*, 742 A.2d 649, 654 (Pa. 1999). Pursuant to Section 301(c)(1) of the Workers' Compensation Act (Act),[5] an employee's injuries are compensable if they "(1) arise[] in the course of employment and (2) [are] causally related thereto." *ICT Grp. v. Workers' Comp. Appeal Bd. (Churchray-Woytunick)*, 995 A.2d 927, 930 (Pa. Cmwlth. 2010). Further, an employee must demonstrate that she is disabled as a consequence of the work-related injury. *Cromie v. Workmen's Comp. Appeal Bd. (Anchor Hocking Corp.)*, 600 A.2d 677, 679 (Pa. Cmwlth. 1991). Unequivocal medical evidence is required where it is not obvious that an injury is causally related to the work incident. *Id.* "The question of whether expert medical testimony is unequivocal[] and, thus, competent evidence to support factual determinations is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "In such cases, we review the testimony as a whole and may not base our analysis on a few words taken out of context." *Id.* "Taking a medical expert's testimony as a whole, it will be found to be equivocal if

---

[5] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg College)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). "[M]edical testimony is unequivocal if a medical expert testifies, after providing a foundation for the testimony, that, in his professional opinion, he believes or thinks a fact exists." *O'Neill v. Workers' Comp. Appeal Bd. (News Corp. Ltd.)*, 29 A.3d 50, 57 (Pa. Cmwlth. 2011).

In addition to this requirement that a medical expert's testimony be unequivocal, the medical expert's testimony also must reflect the expert's adequate understanding of the facts to be competent. *Sears, Roebuck & Co. v. Workmen's Comp. Appeal Bd.*, 409 A.2d 486, 490 (Pa. Cmwlth. 1979). In reviewing an expert's testimony on this basis, we must consider whether the expert "had sufficient facts before him upon which to express" his medical opinion. *Id.* A medical expert's opinion will be held to be incompetent only when the opinion is based solely on inaccurate or false information; when the record as a whole contains factual support for an expert's opinion, the opinion is not incompetent. *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001).

Here, the WCJ's finding that, in addition to the accepted lumbar sprain, Claimant also sustained a lumbar strain, lumbar radiculopathy, cervical myelopathy, and a central cord compression as a result of the January 26, 2018 work-related incident is supported by substantial evidence. Dr. Ochalski credibly testified that, as a result of the January 26, 2018 work-related incident, Claimant sustained a lumbar sprain/strain, lumbar radiculopathy, cervical myelopathy, and a central cord compression/injury. Employer, nevertheless, suggests that there is not substantial evidence of record to support the WCJ's finding because: (1) Dr. Ochalski's testimony in support of the expansion of Claimant's injury description to include

19

cervical myelopathy and a central cord compression/injury was incompetent and equivocal; (2) the WCJ did not give proper weight to the facts and circumstances surrounding Claimant's May 10, 2018 non-work-related fall; and (3) Claimant was not credible due to her false testimony relative to her prior complaints and diagnoses and an alleged driving restriction. We disagree.

First, there is simply no evidence of record to suggest that Dr. Ochalski's opinion that Claimant sustained a lumbar sprain/strain, lumbar radiculopathy, cervical myelopathy, and a central cord compression as a result of the January 26, 2018 work-related incident was based only upon possibilities, was vague, left doubt, or was based on inaccurate or false information. *See Kurtz*, 794 A.2d at 449; *Sears, Roebuck & Co.*, 409 A.2d at 490. Although Dr. Ochalski may not have been aware of the exact particulars of Claimant's prior back and neck injuries and the treatment that Claimant received in connection with those injuries prior to the time of his deposition, Dr. Ochalski testified that there was nothing in Claimant's prior medical records that changed his opinion that Claimant's lumbar sprain/strain, lumbar radiculopathy, cervical myelopathy, or central cord compression are causally related to the January 26, 2018 work-related incident. In fact, Dr. Ochalski explained that Claimant's preexisting back and neck issues actually predisposed her to developing the spinal cord injury that she sustained as a result of the January 26, 2018 work-related incident. In addition, the fact that Dr. Ochalski may not have had all of Claimant's prior medical records goes to the weight of his testimony, not his competency. *See Huddy v. Workers' Comp. Appeal Bd. (U.S. Air)*, 905 A.2d 589, 593 n.9 (Pa. Cmwlth. 2006). Furthermore, while Dr. Ochalski may have indicated that he was "impressed" that Claimant could fracture her ankle from a ground-level fall and that it was "certainly possible" that

20

Claimant could have injured her neck and low back as a result of the May 10, 2018 non-work-related fall, we will not, as Employer would like us to do, take these few words of Dr. Ochalski's testimony out of context and ignore the remainder of his testimony. *See Amandeo*, 37 A.3d at 80. "Certainly possible" does not express an unequivocal medical opinion. Dr. Ochalski's testimony, when taken as whole, establishes that the cause of Claimant's lumbar sprain/strain, lumbar radiculopathy, cervical myelopathy, and a central cord compression was the January 26, 2018 work-related incident, not the May 10, 2018 non-work-related fall.

Second, while we are mindful of the fact that Claimant's May 10, 2018 non-work-related fall was significant enough to cause Claimant to suffer a fractured left ankle, we cannot, in light of Dr. Ochalski's credible testimony, conclude that the WCJ did not give proper weight to the facts and circumstances surrounding that fall. As noted above, Dr. Ochalski's testimony, when taken as a whole, establishes that Claimant sustained a lumbar sprain/strain, lumbar radiculopathy, cervical myelopathy, and a central cord compression as a result of the January 26, 2018 work-related incident. Dr. Ochalski explained that, while there may have been a delay in diagnosing Claimant with cervical myelopathy and central cord compression, Claimant had reported neck pain, neck stiffness, and leg/motor weakness to both her family doctor and Nurse Miller prior to the May 10, 2018 non-work-related fall. Dr. Ochalski further explained that Claimant had symptoms and physical examination findings that predated the May 10, 2018 non-work-related fall that were early indicators of myelopathy. Given this credible medical testimony, the circumstances surrounding the May 10, 2018 non-work-related fall were irrelevant to the WCJ's determination.

21

Third, by calling into question the truthfulness of Claimant's testimony, Employer is asking this Court to reweigh the credibility of Claimant's testimony, which we will not do. *See Elk Mountain Ski Resort, Inc.*, 114 A.3d at 32 n.5. "Questions of credibility and the choice between conflicting testimony[—*i.e.*, a witness's inconsistent testimony or the conflicting testimony of two or more witnesses—] are for the [WCJ], not this Court." *Am. Refrigerator Equip. Co. v. Workmen's Comp. Appeal Bd.*, 377 A.2d 1007, 1010 (Pa. Cmwlth. 1977).

Employer further suggests that, by finding Dr. Peppelman's testimony to be not credible or persuasive on the basis that Dr. Peppelman had only examined Claimant on one occasion, the WCJ somehow reversed the burden of proof and created an "insurmountable hurdle" that Employer could never overcome, thereby violating its constitutional right to due process. Employer ignores, however, that it is well settled that a WCJ may give "greater credence . . . to the testimony of a treating physician than to a physician who examines [a claimant] simply to testify for litigation purposes." *D.P. "Herk" Zimmerman, Jr., Inc. v. Workmen's Comp. Appeal Bd. (Himes)*, 519 A.2d 1077, 1080 (Pa. Cmwlth. 1987). This is exactly what the WCJ did here. The WCJ concluded that Dr. Ochalski's testimony was credible because he is Claimant's treating physician and he had the opportunity to treat and examine Claimant on multiple occasions, whereas Dr. Peppelman only examined Claimant on one occasion. If this was not enough, the WCJ went even further with his credibility determinations by explaining that Dr. Ochalski's testimony was consistent with Claimant's initial complaints of pain that radiated into her neck and leg weakness following the January 26, 2018 work-related incident, that Dr. Peppelman admitted that Claimant had complained of pain that radiated into her neck at the January 30, 2018 visit with her family doctor, and that Dr. Peppelman

22

acknowledged that leg weakness is a symptom of cervical myelopathy. Thus, we cannot find fault with the WCJ's decision to credit Dr. Ochalski's testimony over Dr. Peppelman's testimony.

For all of these reasons, we cannot conclude that the Board committed an error of law by affirming the WCJ's decision to grant Claimant's claim petition, because the WCJ's finding that, in addition to the accepted lumbar sprain, Claimant also sustained a lumbar strain, lumbar radiculopathy, cervical myelopathy, and central cord compression as a result of the January 26, 2018 work-related incident is supported by substantial evidence.

## B. Substantial Evidence – Termination Petition

Employer argues that the Board erred by affirming the WCJ's decision to deny its termination petition because it met its burden of proving that Claimant had fully recovered from her January 26, 2018 work-related injury as of January 10, 2019. Employer contends that Dr. Peppelman's credible opinion—which Employer suggests is supported by Dr. Ochalski's concessions that Claimant suffered from back and neck problems, including age-related degenerative changes, prior to the January 26, 2018 work-related incident—establishes that Claimant had fully recovered from her work-related injury as of January 10, 2019, required no further treatment therefor, and was capable of returning to work without restrictions. In response, Claimant argues that the WCJ properly denied Employer's termination petition, because the WCJ rejected Dr. Peppelman's testimony that Claimant had fully recovered from her January 26, 2018 work-related injury as not credible.

To succeed in a termination petition, the employer bears the burden to prove that the claimant's disability has ceased and/or that any current disability is unrelated to the claimant's work injury. *Jones v. Workers' Comp. Appeal Bd. (J.C. Penney*

23

*Co.*), 747 A.2d 430, 432 (Pa. Cmwlth.), *appeal denied*, 764 A.2d 1074 (Pa. 2000). An employer may satisfy this burden by presenting unequivocal and competent medical evidence of the claimant's full recovery from her work-related injuries. *Koszowski v. Workmen's Comp. Appeal Bd. (Greyhound Lines, Inc.)*, 595 A.2d 697, 699 (Pa. Cmwlth. 1991). Furthermore, in order to terminate benefits, an employer must prove that all of a claimant's work-related injuries have ceased. *Central Park Lodge v. Workers' Comp. Appeal Bd. (Robinson)*, 718 A.2d 368, 370 (Pa. Cmwlth. 1998).

Here, Employer is essentially suggesting that the WCJ should have granted its termination petition because there is substantial evidence of record to support a finding that Claimant had fully recovered from her work-related injury. The real issue before this Court, however, is whether there is substantial evidence to support the WCJ's necessary findings, in this instance, that Claimant has not fully recovered from her January 26, 2018 work-related incident. While Dr. Peppelman may have opined that Claimant only sustained a lumbar sprain/strain as a result of the January 26, 2018 work-related incident and that Claimant had fully recovered from that injury as of the date of his IME, Dr. Ochalski opined that, in addition to the lumbar sprain/strain, Claimant also sustained lumbar radiculopathy, cervical myelopathy, and a central cord compression as a result of the January 26, 2018 work-related incident and that Claimant continues to suffer from and require further treatment for the cervical myelopathy and central cord compression. We stress that it does not matter if there is evidence in the record that could support a finding contrary to that made by the WCJ; the only inquiry is whether there is substantial evidence of record to support the WCJ's findings. *Hoffmaster*, 721 A.2d at 1155. The WCJ, as the ultimate fact-finder, had the discretion to credit Dr. Ochalski's

testimony over Dr. Peppelman's testimony.  For these reasons, we cannot conclude that the Board committed an error of law by affirming the WCJ's decision to deny Employer's termination petition, because there is substantial evidence of record to support the WCJ's finding that Claimant has not fully recovered from her January 26, 2018 work-related injury.

## IV.  CONCLUSION

Accordingly, we affirm the Board's order.

 

 

_____

P. KEVIN BROBSON, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Davita, Inc.,                                    :
                            Petitioner          :
                                                 :
            v.                                   :     No. 1207 C.D. 2020
                                                 :
Lisa Rogers (Workers'                           :
Compensation Appeal Board),                     :
                            Respondent          :

# **O R D E R**

AND NOW, this 9ᵗʰ day of November, 2021, the order of the Workers'
Compensation Appeal Board, dated October 29, 2020, is hereby AFFIRMED.

_____
P. KEVIN BROBSON, President Judge